Good morning, Mr. Earle. Welcome, please proceed. Thank you, Your Honor. May it please the Court, my name is Craig Deeks. I represent the appellants who are civilian grade 12 engineering technicians at the Puget Sound Naval Shipyard. This case arises under the Fair Labor Standards Act. The appellants and a number of other employees contended were improperly classified as exempt for overtime purposes. The government responded to their lawsuit with a motion for summary judgment that raised the affirmative defense of accord and satisfaction. As to most of the original plaintiffs, the trial court denied that defense and their claims were settled. However, as to the 12 appellants and a few others, the trial court granted the defense and dismissed the appellants' claims. Thus, the issue presented by this case is whether the Navy affirmatively negated the existence of even a fact issue as to their right to extinguish the appellants' claims under the Doctrine of Accord and Satisfaction. And your major argument is that the agreement here requires implicitly or explicitly that everybody, including future employees, be treated the same? That's correct, Your Honor. So that when they reach it, we are explicitly disrequired. So do you concede that there's no explicit requirement? Your Honor, we would contend that the explicit requirement with regard to this element we're talking about, consideration, is found in paragraph 12 of the agreement. I believe that's on page 52 of the appendix, Your Honor. It states, the parties agree that the persons who occupy the positions or who have occupied the positions identifying an attachment deed shall be FLSA exempt. Now, the trial court interpreted that to bind them as to past 12s and to present 12s, but not as to future 12s. Well, I mean, you can call it an interpretation or not, but isn't that what it clearly say? Persons who occupy, that's present, right? And persons who have occupied, there's past. And you want us to construe this language to also include a third category of future employees. Your Honor, I would even contend that it's unreasonable not to concede that. Well, let me just answer my first question. Yes, ma'am. I mean, you want us to construe this language to include a third category of future employees. That's right, Your Honor. And I think that the language reasonably can be construed only in that manner for two reasons. If we disagree with you, do you necessarily lose? No, we don't, Your Honor, because we have an argument with regards to a separate element of the accord and satisfaction doctrine. And besides element of consideration, that's the element of meaning of the bonds. But getting back to the consideration element for a moment, we used a hypothetical in the brief, and I'd like to return to it. If the employer or one of the warehouse employees, let's say, to wear uncomfortable steel-toed shoes, the employer's resistant, and there's an agreement between the union and the employer that employees will wear – warehouse employees will wear steel-toed shoes in exchange for an incentive program. Now, it would be unreasonable to interpret that to mean that current warehouse employees have to wear the steel-toed shoes, but people that start in two or three days from now, they can wear sandals or whatever they want to wear. The language would be exactly the same. In the same token, Your Honor, it's unreasonable to conclude that the union would ever agree to a situation in which you've got this separate small categories of current 12 that are going to be declared exempt for all time, but the Navy has total discretion in the future to any 12 that comes along to make a decision that is exempt or not exempt as they choose. So – but isn't the relief of that kind of thing that you say the Navy was wrong and the answer is that the future employees, therefore, are required to be exempt as well? Is that the answer? I mean, you're saying that you construed the agreement to say that all employees, current, present, and future, should be exempt, correct? That's right, Your Honor. Well, and if they breach the agreement, then the legitimate answer is that the government should go back – the remedy would be the government goes back and makes, if indeed all future employees remain non-exempt, those people should, you know, be made exempt, right? Your Honor, and that certainly was one solution. That was a solution that was never suggested by the government nor advocated by the union. And in fact, what the union wanted to do was to re-examine the issue. You have to remember that at this point in time – But is your position that the misclassification of some later hired employees vitiates the entire agreement as if it never existed? Your Honor, what we indicate is that that's a failure of consideration that deprives the government of the right to use the accord and satisfaction defense – No, I think you're saying more than that. I think you're saying that the entire agreement explodes as if it never existed. Your Honor, I guess that we are, in effect, saying that, and you've got to realize that we have so much – – confusion, not some arbitrary or deliberate or castigating thing by the government. And number two was in a limited number of cases and therefore arguably a de minimis noncompliance with the bargain for the agreement. Secondly, it was a situation in which you had employees working side by side, doing the same job, working the same number of hours, drawing literally thousands of dollars different pay each year for doing the same job. This wasn't some small, minor error by the Navy. Moreover, there is – But that's terrible. That's unfair. Why does that give you a cause of action? Your Honor, of course, it's our contention, and this goes to the other, the meeting of the minds, that the employees were never deprived by this agreement of their individual right to pursue effluent state litigation to pursue their claims. But even so, what this did provide was an opportunity for the parties, an opportunity that they took to reevaluate the correctness of the decision to treat 12s as exempt or non-exempt. And the ultimate resolution was that the 12s at all six shipyards are now treated as non-exempt. Mr. Deese, these people got exactly what they bargained for. They just got a little miffed because they saw some people next to them that were getting a different team. That's what it comes down to. Your Honor, they didn't – If this had never happened, if there hadn't been this mistake with respect to the other employees, you wouldn't be here, correct? Your Honor, two things. Number one is – No, you wouldn't, would you? If there had never been a misclassification of the other employees as non-exempt, the great likelihood is that we would not be standing before you today. But these people, the people you're representing, got exactly what they bargained for under the agreement. Your Honor – They're just disappointed or irked or whatever you want to say that some other people are being treated differently. Your Honor, the agreement that the employees made – and keep in mind that they made this through the union – was we'll agree that all employees in this category will be treated this way. All employees in this category will be treated this way. They never made the agreement that the Navy can pick and choose and treat different employees doing the same job differently. And that's what the Navy needs to have respect for. I mean, supposing these – they're bothered that these other employees are getting paid more than them, right? That's correct. Supposing somehow these other employees have been getting paid less than them through some mix-up. Would they be coming in then? The other employees would be coming in and saying, we're being paid inappropriately. But these people wouldn't have standing to complain for them. These particular employees would not have standing to complain for them, no, Your Honor. They wouldn't be the injured parties in that case. Let me interject. So there's another issue that's kind of separate and distinct, right, which is whether or not these employees could waive their ability to negate these issues? That's right, Your Honor. Do you agree with that? Do you view that as really a separate, entirely separate issue? It's an entirely separate issue, Your Honor, and it goes to an entirely separate element, the meeting of the minds element of the Accord and Satisfaction Doctrine. But are you saying that somehow they didn't have – that the union didn't have the legal authority to waive the rights of these parties to forego litigation? Or are you just saying that it didn't happen in this instance? Your Honor, we can't say now in light of O'Connor that the union didn't have the right. This Court's decision in O'Connor, which was decided much later than 1995 when the Supreme Court was tendered, does indicate that unions can, for federal employees only, waive individual employees' rights. So I can't make that argument today. In 1995, the parties certainly thought that they did not have the authority. So you're agreeing that under the law they can waive it. You're just saying that under the law they did not waive it here. That's correct, Your Honor. And they did not waive it because they didn't explicitly say, we would not litigate this. We just said we would not arbitrate this. That's right, Your Honor. In fact, the – But you just characterized the other – in response to the other question, you characterized quite eloquently the fact that under this agreement they agreed that they would be exempt. Well, how much more explicit can they be? You're saying they turned around, they agreed that they would be exempt while they occupied these positions, and then they ought to be able to go into court and litigate whether or not they're exempt. Your Honor, what they agreed in the agreement was the union agreed to resolve the grievances on the basis of the agreement that was made and that the union would not arbitrate grievances in the future. As the evidence indicates, there were specific discussions in the negotiation of the 95 agreement that to the effect that the parties realized that the employees themselves nonetheless could litigate individual FLSA claims if they chose to do so. In fact, there's evidence in the record that the Navy spokesperson in the 95 agreement asked the attorney representing the union – asked the attorney to agree that if there were future employees litigation that he would not represent those employees, and he declined to do that. But the only thing they agreed to – the only thing the union representing the employees gave up in this MOU was that they agreed that their positions were exempt. Right? I mean, they got the benefit of all this other stuff in exchange for the promise that the positions which they occupied were exempt, FLSA exempt. Correct? That they would – and that all employees in those positions would be treated as FLSA exempt. The union could never have made an agreement that would allow for differing treatment of the employees. No, forget the different treatment. We still have to forget, though, that these were two separate issues. I'm going with the second one. Okay. So you're saying what they agreed to in exchange for what they got was an agreement that they would be FLSA exempt. And you're saying that notwithstanding that agreement, which is all they gave up in this MOU, that they could still go into court and argue that they were not FLSA exempt. That the individual employees on their own could go into court and file FLSA claims if they chose to disagree. What the union did was resolve the grievances that had been filed by individual employees and agreed not to arbitrate grievances in the future. They explicitly gave that up. The name implies from that that they also gave up the right of the employees to file individual claims. It had the union negotiated at the time. I don't think that it's helpful to talk about right to file. They can file anything they want at any court. If they pay the filing fee, they can file. Then it's filed. The question is what happens after it's filed. And so it seems like the question is whether having agreed through the union that the positions are not covered by the labor act, the employees should be allowed in a subsequent legal action in a court of law to take the opposite position. And it seems commonsensical that the answer is no. It's the very same people. They can't concede something one week and then the next week go and take the opposite position in a lawsuit. Sure, they can file it, but they should be thrown out summarily because they're trying to take the opposite position to what they just agreed to with the name. Your Honor, you've got to remember that this agreement was in the context of a global settlement, settling thousands of grievances over many different positions. There undoubtedly was a lot of falsehood, but the parties in 1995, when this agreement was negotiated, did not believe that they had the power to do anything to negotiate away the ability of individuals to litigate their FLSA rights. I don't think it means much what the union representative thought or what the Navy official thought or even what the individual grievance thought. What's clear is that through the union, the individual grievance, who are the same plaintiffs in the lawsuit, agreed that they weren't covered by the act. Then they went to court and tried to say, we are covered by the act. And the court said, you can't do that. Your Honor, they made an agreement that they were going to resolve these individual grievances on that basis in exchange for the Navy's agreement to do certain things. And the reason that what they thought is important is because both parties thought that. In 1995, that was the law, at least with regards to private sector. The meaning of the mind doesn't have to concern downstream matters of law. The meaning of the mind was, we'll change our position on classification if you give us some benefits. It was clear what the benefits were. It was clear what the change of position on classification was. That's where the meaning of the mind was. In the eyes of the law, what happens later doesn't require a meaning of the mind. That's why we call it in the eyes of the law. It has nothing to do with the subjective beliefs of individual people. Mr. Chiefs, let me ask you. Say you have a plant with 100 employees in it. And 10 employees come in and file a grievance that we have here. Now, the union at that point, when it comes in and represents them in that grievance, is only representing those individual employees who are grieving, correct? That's correct. And that's quite the case here. Right. It's not like a collective bargaining situation. Well, it's not collective bargaining per se. It's a group grievance, which I assume could be looked at as one. I guess what I'm trying to get at is these employees struck a particular deal that they wanted to – they said, okay, we'll be exempt in return for certain things. Okay? Other employees out there might not want to do it, then. What if you have a situation where other employees, the other 90 employees of the 100-employee plant, don't want to be exempt? Your Honor, if the other 90 employees don't want to be exempt, of course, they're not bound by that group grievance settlement. And they can go out and file a lawsuit or file a grievance as appropriate to contest their own status. But what – to follow up on your hypothetical, what the Navy is saying here is, okay, we made that agreement for those 10. But now we can treat the other 90 in the same position, doing the same work, entirely differently. And that's not a violation of the agreement we made with these 10. That's right. Let the other 90 complain. Excuse me, Your Honor. Time has expired. We'll hear from the element. Thank you. May it please the Court. This Court should affirm the decision of the United States Court of Federal Claims in entering judgment as a matter of law for the United States on its defense of accord and satisfaction. There is no law, regulation, or agreement that obligates the government to provide appellants the relief that they seek. This is not a case where the appellants received less than what they were entitled to under the settlement agreement. As the Court previously identified, this is a case where certain colleagues of the appellants were mistakenly paid more in error, and the appellants now argue that the government should repeat those mistakes to benefit them. Each of the appellants in this case filed a grievance regarding their FLSA status prior to the 1995 MOU. That MOU settled those grievances by giving appellants an incentive program which gave them monetary awards and comp time in exchange for an FLSA exempt status. Let's say hypothetically we're talking about minimum wage or time to have under the FLSA. So if the employer and the employee union agree, okay, these people are underpaid, they've got a grievance because they're only getting paid $1 an hour, and their wage is $5.75, we're going to reach a settlement, and we're going to give them $3 an hour. Do the employees covered by that settlement agreement and that grievance still have a right to an accord? Well, Your Honor, it's a little different because, as you know— Well, I have to answer my question first, and then you can speak to that. Okay, if I'm understanding your question correctly, if the government were paying less than minimum wage, and the union entered into an agreement where both parties agreed to pay something that's less than minimum wage, your question is whether that— Whether the employees would still be able to go to court to pursue their rights under the FLSA? Not if they're government employees under Conner. If it was a private sector, it would be different. But under Conner, unions representing federal employees can represent all the employees and make those concessions. But the issue here isn't who's covered by the agreement. We're not here talking about people who didn't agree but then were covered by the resolution of the agreement. That's correct, Your Honor. You're here to the same people. So I don't understand what O'Connor has to do with this case. Well, you're right, Your Honor, in that the appellants are not arguing that there was no competent party. They're not arguing that it's the element of competent parties. What they're arguing is meeting of the minds and consideration. They argue that because there was a lack of consideration and there was no meeting of the minds, that the government should not have been granted summary judgment on their defense of accord and satisfaction. But their argument that the government offered as consideration to treat all of these employees equally is not supported by the plain language of the agreement. There's nowhere in the MOU where the government agreed to treat all of these employees equally. The government agreed to treat them as exempt. And that's exactly what was done to the appellants in this case. They were designated exempt. They were given the benefits of the incentive program. Therefore, there's nothing, there's no law, there's no regulation, there's no agreement that's been violated here. There is a complete accord and satisfaction of the grievances that they have filed prior to this MOU. There's no question that the grievances were fully resolved by the MOU. But isn't there an underlying question of what's the right legal answer as to whether the Federal Immigration Act applies to these double 12 engineers or not? Well, currently these engineers are designated as exempt. And so the FLSA did apply to them and they filed grievances arguing that they should be exempt. And those grievances were settled. They were resolved by the union with this MOU. I don't think I'm being clear. Isn't there a difference between resolving the grievance, maybe fudging the law as a labor relations compromise, and having a determination by a court of law of the scope of a statute? Aren't these two different things? No, Your Honor. They're not trying to go back on... It seems to me that concessions made by the union fully resolve the grievances. That's correct. And they can't resurrect the grievances because they have a different view now than the union took on their behalf then. That's correct. But I don't see how being bound and limited in that way necessarily means that they're not allowed to ask the court of law to construe a federal statute. Well, they're not asking the court to construe a federal statute. They're asking the court to hold that the Federal Labor Relations Act and its provision of time and a half for overtime apply to the positions that they used to hold. Right. But they are asking for a construction of a federal statute. Right. But what we have here is the appellants asking for the overtime pay under the FLSA and an accord in satisfaction where they settle those grievances. That's what they're asking. Of course they settle grievances, but they're saying settling the grievance is separate from getting a construction by a court of law of the statute. But in this case, construing the statute one way or the other doesn't give them the relief they seek because they're still barred from recovering what they seek by the settlement agreement. So construing the statute after covering them or not covering them, there's no outcome on the resolution of this case. In other words, you're saying even if they were to prevail on the court of law and say it's a matter of law, the positions they issued are subject to FLSA, that there would be no reason for these folks individually having to agree that what they were doing, at least in this immediate period, they were doing themselves. Exactly. That's correct, Your Honor. Exactly. I'm sorry. Exactly. That's correct. I now want to address the appellant's argument that the union officials were unaware that they could act on behalf of the individual members. And although it's true that the O'Connor decision did come out after the 1995 MOU, Section 5 of the United States Code, I'm sorry, Chapter 5 of the United States Code, Section 7114, which was enacted in 1978, seven years before the MOU, states that a union for government employees may, quote, represent and is entitled to act for, unquote, its members. Therefore, the argument that the union did not know that they could act upon their members because O'Connor came out afterwards lacks merit because there is a statute that says that the union could act on behalf of federal employees. He doesn't disagree with that. Mr. Dietz isn't saying they were not allowed to represent the grievance. He's saying they were allowed to represent the grievance. So I don't understand your point. Well, Mr. Dietz had argued that there was no meeting of the minds because the union officials did not know that they could bargain away the rights of these appellants. And that's where his argument came in that the union officials did not know. And what I'm trying to show is that there was a meeting of the minds, and their argument that the union officials were unaware of their ability or their powers is not supported not only by that statute, but also if you look at the settlement agreement, I believe it's paragraph 28, and that's on page 60 of the appendix, the parties there represented that they, quote, have full authority to enter this agreement and to make the promises, obligations, and considerations contained therein. I thought he agreed with that. Perhaps he did, Your Honor, and if he did agree with that, then? The disagreement seemed to be whether the authorized act of the union blocked a later lawsuit, not whether the union was authorized to act in the grievance context. Well, Your Honor, I think that for these employees, any later lawsuits would be blocked because they had already settled these grievances with this MOU. The grievance that they filed before the 1995 MOU is the exact same dispute that they're bringing out, that they are entitled to an FLSA pay and should have been designated as non-exempt. I agree with that. In other words, they set up the issue by selling settlement grievances. That's correct, Your Honor. For these reasons, the decision of the United States Court of Federal Claims should be affirmed. Mr. Keats, we'll give you two minutes for rebuttal. Thank you, Your Honor. Your Honor, I want to try and make two quick points. To follow up on one of the hypotheticals, what the Navy is arguing is that if the day after this agreement was signed an employee were appointed to the same position and decided to file a lawsuit in court contesting that the position was misclassified, even if that employee won and the court said that people doing this job have to be paid overtime, they're non-exempt, the Navy's position is that would not apply to the people covered by this grievance settlement because we have an accord and satisfaction as to them and so for all time. And that's the scope of the accord according to the Navy. For all time, these particular people are bound by a real settlement that the Union made. Now, the Union, you know, there's been a lot of talk about what did the Union know about their ability to waive rights. Why that's important is not just what the Union knew or didn't know. It's what the parties discussed. What was the meaning of the minds at the bargaining table? But if both sides had conversations in which they both recognized and there's evidence to support this that you couldn't bind the employees from going into court and suing, then that's not part of the meaning of the minds. And what we're saying is there's evidence that there was exactly that kind of conversation at the time the 1995 agreement was done. Now, the Union officials, you know, and that's wrong when you look at the 2001 agreement, the supplemental agreement. Specifically, again, the Navy said, now when we make this agreement, we want you to promise you won't sue for back pay and that the employees won't sue. And the Union officials said, no, we're not going to waive the employees' right to sue. We'll waive it. And for that reason, Your Honor, we do feel that both of these elements warrant a reversal of the trial court's decision. Thank you. All right. Thank you. Thank both counsel. We'll take this case under advisement.